IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 14-CR-00116-LRR |
| | ) | |
| | ) | **Count 1** |
| Plaintiff, | ) | 18 U.S.C. § 371 |
| | ) | Conspiracy to: Make and Use |
| | ) | Materially False Statements and |
| vs. | ) | Documents; Sell Misbranded |
| | ) | Meat; and Commit Mail and Wire |
| | ) | Fraud |
| WILLIAM B. AOSSEY, JR., | ) | **Counts 2 - 8** |
| | ) | 21 U.S.C. § 611 |
| | ) | False Statements on Export |
| Defendant. | ) | Certificates |
| | ) | **Counts 9 - 15** |
| | ) | 18 U.S.C. § 1341 |
| | ) | Wire Fraud |
| | ) | **Wire Fraud Forfeiture Allegation** |
| | ) | **Counts 16 - 18** |
| | ) | 18 U.S.C. § 1957(a) |
| | ) | Money Laundering |
| | ) | **Count 19** |
| | ) | 18 U.S.C. § 1956(h) |
| | ) | Money Laundering Conspiracy |
| | ) | **Money Laundering Forfeiture** |
| | ) | **Allegation** |
| | ) | |

PRESENTED IN OPEN COURT
BY THE
FOREMAN OF THE GRAND JURY
And filed   10/23/2014
ROBERT L. PHELPS, CLERK

1

## INDICTMENT

The Grand Jury charges:

## A.    Introduction

At all times relevant to this Indictment:

### United States Department of Agriculture (USDA)

1. The USDA Food Safety and Inspection Service (FSIS) was the public health agency within USDA responsible for ensuring that beef products were safe, wholesome, and accurately labeled.

2. USDA Agriculture Marketing Service (AMS) was the division of USDA responsible for verifying that beef originating in the United States met certain standards and regulations established by the USDA and by each country that imported beef products from the United States. AMS maintained an online database that was to be used by FSIS inspectors and exporters to verify that each shipment of beef intended for export from the United States was properly labeled and eligible to be exported to the designated country.

3. In order to fulfill its regulatory and oversight responsibilities, the USDA depended upon exporters to accurately label, mark, and brand their beef products intended for export from the United States. This included the requirement that all exterior beef product packaging and product labels contain a USDA establishment number to accurately reflect the source of the products.

2

4.    In addition, certain documents were required to be accurately completed to attest to: the identity of the USDA establishment from where the meat originated; the wholesomeness of the meat; and to provide other information required to assist the USDA in ensuring that the meat was fit for consumption and eligible to be exported to the designated importing country.

5.    Among the specific documents required by the USDA to be accurately completed in order for beef to be eligible for export from the United States were an "Application for Export Certificate," FSIS Form 9060-6; a so-called "Export Certificate," FSIS Form 9060-5; and a "Letterhead Certificate," FSIS Form 2630-9.

6.    In addition, all labels attached to or contained within beef product packages shipped for export from the United States were required, prior to their use, to be approved by USDA for content, and to ensure that any label or ink that may come in contact with the beef would not contaminate the beef.

<u>Midamar Corporation</u>

7.    Midamar Corporation (Midamar) was incorporated as a business in the State of Iowa and operated out of its headquarters at 1105 60th Ave S.W., Cedar Rapids, Iowa.

8.    Midamar's Corporate directors, as reflected in filings with the Iowa Secretary of State, were defendant, WILLIAM B. AOSSEY, Jr. (Midamar's founder); "J.A." and "W. "Y" A." (defendant's sons); and "J. S."

3

9. Midamar was in the business of selling and distributing food products throughout the world. Midamar marketed its products as meeting the strictest "Halal" beef slaughtering standards.

### Foreign Country Requirements

10. Malaysia and Indonesia restricted the import of Halal beef to products that had been certified by a specifically approved certifying entity.

11. In addition to the above requirement, (by at least May of 2008) Indonesia and Malaysia each restricted the import of Halal beef products to those products that had been slaughtered at a facility specifically approved by each respective country.

12. In order for beef products to have been eligible for export from the United States, the shipment must also have complied with any restrictions imposed by the importing country.

13. It was incumbent upon the beef exporter to ensure that the beef product was eligible for export to the intended importing country. Therefore, the exporter was required to truthfully and accurately complete FSIS Form 9060-6, "Application for Export Certificate," which was to include a specification of all products contained in the shipment and a certification that the products met the import requirements of the importing country. The completed form was to be presented by the exporter to an FSIS inspector for approval and signature.

4

14. Upon approval of the Export Certificate Application by FSIS, the exporter was to truthfully and accurately complete the Export Certificate applicable to the importing country and have that certificate approved by the appropriate official (typically a USDA veterinarian or another government official), as designated by the importing country.

15. When a shipment had been properly coded and authorized for export, AMS would issue a certificate (Audit, Review, and Compliance Form 1030 (Form 1030)) to verify to the exporter and to FSIS that the shipment had been authorized. This certificate was to accompany the shipment to the export destination. AMS charged exporters a fee for this Export Verification (EV) service and for the issuance of each EV certificate.

### Islamic Services of America

16. Islamic Services of America (ISA) was incorporated as a business in the State of Iowa and operated out of its headquarters at 1105 60th Ave S.W., Cedar Rapids, Iowa.

17. ISA's corporate filings with the State of Iowa listed defendant, WILLIAM B. AOSSEY, JR., as a Director; J.A. as the Registered Agent and Secretary; and W."Y"A. as the President and Treasurer.

18. ISA was in the business of certifying food products as Halal for customers throughout the world.

5

19. ISA was one of the few organizations approved by Malaysia and Indonesia to certify Halal beef for import into those countries.

20. ISA would inspect and certify beef slaughter or processing facilities on a periodic basis for purposes of determining whether the facility could be approved for Halal slaughter or processing. If approved, ISA would issue the facility a certificate of approval for display by the approved facility.

21. ISA would typically generate several documents for beef products, including: a certificate of origin to accompany the product from the ISA-certified slaughter facility to any subsequent processor; a "Certificate of Islamic Slaughter" (also called a "Halal Export Certificate") to accompany products intended to be exported from the United States; and a so-called "Health Certificate," also intended to accompany exports. ISA's logo was also placed on the boxes and packages containing the purported Halal beef that originated from an ISA certified facility.

22. The certificates and other documents completed by ISA, along with the ISA logo placed on boxes or other packaging, were intended by ISA to attest that the beef had been slaughtered and processed at the facility noted on each certificate, in accordance with the standards represented by ISA, and in compliance with the distinct requirements of each country by whom ISA was recognized as an approved Halal certifier, and to where the ISA certified beef was

6

to be exported.

## Tri-Bin, Inc.

23. Tri-Bin, Inc., (Tri-Bin), owns the land and building located at 1105 60th Avenue S.W., the corporate offices and warehouse of Midamar Corporation. ISA's office was also located in the same building. Midamar issued checks to Tri-Bin on a monthly basis that included rent payments for its operating location. Tri-Bin is owned by defendant, WILLIAM B. AOSSEY, JR.

## PM

24. PM operated a beef slaughter and production facility in Windom, Minnesota.

25. PM operated under United States Department of Agriculture (USDA) establishment number 683.

26. PM was not certified by Malaysia or Indonesia to export beef products to either country. Without such certification PM products were not authorized to be imported into either country.

## O.P.C., Inc.

27. O.P.C. operated a beef slaughter and production facility in Omaha, Nebraska. O.P.C. provided custom beef slaughter services for both religious and non-religious slaughter customers.

28. O.P.C. operated under United States Department of Agriculture (USDA) establishment number 889A.

7

29.   O.P.C. occasionally slaughtered and processed beef for Midamar but did not do so between about the middle of July 2007 through about April 2010.

30.   O.P.C. was approved by both Malaysia and Indonesia to export beef to those countries between at least July 2007 and 2010, but O.P.C. did not sell any beef to Midamar during that time.

## COUNT 1
### Conspiracy to Make and Use Materially False Statements and Documents; Sell Misbranded Meat; and Commit Mail and Wire Fraud

31.   Paragraphs 1-30 of this Indictment are incorporated by this reference as if fully set forth here.

32.   Beginning in about 2007, and continuing into at least 2010, defendant, WILLIAM B. AOSSEY, JR., did knowingly and unlawfully conspire and agree with other persons known to the grand jury, to commit the following violations of law:

> 1) in a matter within the jurisdiction of the Department of Agriculture, to cover up material facts by a scheme; in violation of Title 18, United States Code, Section 1001;
>
> 2) in a matter within the jurisdiction of the Department of Agriculture, to make false and fraudulent statements and representations, in violation of Title 18, United States Code, Section 1001;
>
> 3) in a matter within the jurisdiction of the Department of Agriculture, to make and use false documents in violation of Title 18, United States Code, Section 1001;

8

4) to sell in commerce articles that had been misbranded, in violation of Title 21, United States Code, Section 610;

5) to make false statements on export certificates, in violation of Title 21, United States Code, Section 611;

6) to use the mail, or a private or commercial interstate carrier for the purpose of executing or attempting to execute a scheme to defraud, and to obtain money by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1341;

7) to use the wire for the purpose of executing or attempting to execute a scheme to defraud, and to obtain money by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1343.

## Manner and Means of the Conspiracy

33. As set out below, defendant and others known to the United States generated a variety of fabricated certificates and writings, including export documents, that contained falsified information concerning the source and nature of beef products referenced in the certificates and writings. The false certificates and writings were created in order to give the false impression that the accompanying shipments of beef products complied with the import requirements of the countries to where the beef was being shipped, and accurately reported

9

information required by the Department of Agriculture.

34. Customer orders were taken by Midamar for the sale and export of Halal beef products to customers in Malaysia and Indonesia.

35. Midamar placed orders by phone or email with PM for the slaughter and production of beef to be used to fill orders received by Midamar, including from customers in Malaysia and Indonesia;

36. PM shipped beef products to Midamar to fulfill orders placed with PM by Midamar.

37. Beef slaughtered and produced by PM, and shipped to Midamar, was marked by PM with PM's USDA establishment number, 683, on adhesive labels adhered to the exterior of the shipping boxes, or preprinted on the exterior of Midamar product boxes; on the individual vacuum-sealed beef product packages contained inside the shipping boxes; and on the accompanying documentation.

38. The USDA establishment number 683 markings were removed by Midamar employees from the individual vacuum-sealed beef product packages, using acetone or nail polish.

39. Midamar employees produced new labels to be placed on the exterior of the boxes of beef received from PM.

40. Midamar employees substituted USDA establishment number 889A (O.P.C.) in place of USDA establishment number 683 (PM) on the boxes received

10

from PM.

41.   USDA establishment number 889A was placed on the beef products intended for export to Malaysia and Indonesia in place of number 683.

42.   USDA Export Certificates were generated by Midamar for beef products intended for export to Malaysia and Indonesia.  The certificates falsely stated the beef products originated from animals slaughtered at USDA establishment number 889A when, in truth and in fact, the products originated from animals slaughtered at USDA establishment number 683.

43.   Letterhead Certificates were also generated to falsely attest that the beef products intended for export to Malaysia and Indonesia had originated from USDA establishment number 889A when, in truth and in fact, the products originated from animals slaughtered at USDA establishment number 683.

44.   Midamar employees sent the false Export Certificates and false Letterhead Certificates to USDA inspectors and veterinarians for signature, via the U.S. Mail or commercial courier service.

45.   The respective USDA inspectors and veterinarians signed the false Export and Letterhead Certificates in reliance upon the false information contained thereon.

46.   The false and fabricated documents referenced above accompanied the respective beef shipments to Malaysia and Indonesia.

11

47.   The beef shipments were transported by a commercial trucking service to a transshipment point where they were exported via air or sea to Malaysia and Indonesia.

48.   Malaysia and Indonesia accepted the beef shipments referenced above for import into their countries.

49.   Customers in Malaysia and Indonesia paid Midamar for the beef imports referenced above by wire transfer to Midamar's bank account at Cedar Rapids Bank and Trust (CRBT), account number with the last four digits "1568."

50.   On a periodic basis Midamar would "sweep" funds from account "1568" to be applied to its loan/line of credit with CRBT, number with the last four digits "2409."

51.   As needed, Midamar would regularly draw upon its loan/line of credit with CRBT to fund its operating account, from where payments were made, by check and wire, to satisfy ongoing business expenses including payroll, product, rent, and shipping expenses.

52.   Midamar and ISA executives and corporate officers, including defendant, directed, oversaw, and approved of the acts referenced above.

### Overt Acts

53.   In furtherance of the above conspiracy, and to effect the objects thereof, the following overt acts, among others, were committed in the Northern District of

12

Iowa, and elsewhere:

  a. Customer orders were taken by Midamar, via the internet, email, and telephone, for the sale of purported Halal beef products to customers in Malaysia and Indonesia. Each use of the internet, email, and telephone is alleged to constitute a separate overt act.

  b. Midamar placed orders with PM, via email and telephone, for the slaughter and production of beef to be used to fill orders received from customers in Malaysia and Indonesia by Midamar. Each use of email and the telephone is alleged to constitute a separate overt act.

  c. PM shipped beef products to Midamar, and to processors in Iowa as specified by Midamar, to fulfill orders placed with PM by Midamar. Each such shipment is alleged to constitute a separate overt act.

  d. Payments were wired to Midamar's bank account at CRBT, account number "1568," from outside Iowa and outside the United States, including on about the following dates, for shipments of purported Halal beef sold by Midamar. Each such payment is alleged to constitute a separate overt act:

| Date | Amount | From |
| --- | --- | --- |
| 10-30-2009 | $ 7,982.50 | PT Indoguna (Surya Cemerlang) |
| 11-25-2009 | 15,081.33 | Suvinsa |
| 11-24-2009 | 31,794.92 | PT Indoguna (Surya Cemerlang) |
| 12-29-2009 | 16,105.73 | Suvinsa |
| 01-19-2010 | 7,685.00 | Suvinsa |
| 01-19-2010 | 31,874,80 | PT Indoguna (Surya Cemerlang) |
| 01-28-2010 | 74,459.40 | Suvinsa |

  e. USDA Export Certificates were generated, including on about the following dates, each of which is alleged as a separate overt act:

13

|     | Certificate No. | Issue Date |
| --- | --- | --- |
| 1. | MPG-317734 | June 20, 2007 |
| 2. | MPG-317737 | June 20, 2007 |
| 3. | MPG-317751 | August 17, 2007 |
| 4. | MPG-762485 | January 30, 2008 |
| 5. | MPG-762506 | April 24, 2008 |
| 6. | MPG-762632 | June 19, 2008 |
| 7. | MPH-057120 | July 17, 2008 |
| 8. | MPH-057127 | July 31, 2008 |
| 9. | MPH-057135 | August 27, 2008 |
| 10. | MPH-057143 | September 25, 2008 |
| 11. | MPH-057081 | October 21, 2008 |
| 12. | MPF-410206 | April 15, 2009 |
| 13. | MPF-410208 | April 16, 2009 |
| 14. | MPF-410224 | June 10, 2009 |
| 15. | MPH-059082 | September 23, 2009 |
| 16. | MPH-059091 | October 21, 2009 |
| 17. | MPH-059099 | October 30, 2009 |
| 18. | MPH-059111 | November 19, 2009 |
| 19. | MPH-059115 | December 2, 2009 |
| 20. | MPH-059126 | December 30, 2009 |
| 21. | MPE-042868 | January 14, 2010 |
| 22. | MPE-042870 | January 14, 2010 |

f. Letterhead Certificates were generated, for shipments to Malaysia and Indonesia, including on about the following dates, each of which is alleged as a separate overt act:

|     | Certificate No. | Issue Date |
| --- | --- | --- |
| 1. | MPG-317734 | June 20, 2007 |
| 2. | MPG-317737 | June 20, 2007 |
| 3. | MPG-317751 | August 17, 2007 |
| 4. | MPG-762485 | January 30, 2008 |
| 5. | MPG-762506 | April 24, 2008 |

14

| | | |
|---|---|---|
| 6. | MPG-762632 | June 19, 2008 |
| 7. | MPH-057120 | July 17, 2008 |
| 8. | MPH-057127 | July 31, 2008 |
| 9. | MPH-057135 | August 27, 2008 |
| 10. | MPH-057143 | September 25, 2008 |
| 11. | MPH-057081 | October 17, 2008 |
| 12. | MPF-410206 | April 15, 2009 |
| 13. | MPF-410208 | April 16, 2009 |
| 14. | MPF-410224 | June 10, 2009 |
| 15. | MPH-059082 | September 23, 2009 |
| 16. | MPH-059091 | October 21, 2009 |
| 17. | MPH-059099 | October 30, 2009 |
| 18. | MPH-059111 | November 19, 2009 |
| 19. | MPH-059115 | December 2, 2009 |
| 20. | MPH-059126 | December 30, 2009 |
| 21. | MPE-042868 | January 14, 2010 |
| 22. | MPE-042870 | January 14, 2010 |

g. Certificates of Islamic Slaughter were generated and signed by, or on behalf of, the Director of ISA, for shipments to Malaysia and Indonesia, including on about the following dates, each of which is alleged as a separate overt act:

| Certificate No. | | Issue Date |
|---|---|---|
| 1. | 0620-07-5156 | June 22, 2007 |
| 2. | 0921-07-6327 | September 21, 2007 |
| 3. | 0817-07-6177 | August 17, 2007 |
| 4. | 0130-08-6916 | January 30, 2008 |
| 5. | 0424-08-7117 | April 24, 2008 |
| 6. | 0619-08-7805 | June 19, 2008 |
| 7. | 0716-08-7951 | July 16, 2008 |
| 8. | 0731-08-8027 | July 31, 2008 |
| 9. | Jumada II 1429H | August 2008 |
| 10. | 0924-08-8285 | September 24, 2008 |
| 11. | 1022-08-8387 | October 22, 2008 |

15

| | | |
|---|---|---|
| 12. | 0416-09-9160 | April 16, 2009 |
| 13. | 0416-09-9161 | April 16, 2009 |
| 14. | 1006-09-9999 | June 10, 2009 |
| 15. | 0925-09-9610 | September 25, 2009 |
| 16. | 1022-09-9700 | October 22, 2009 |
| 17. | INDO-09-1A | October 30, 2009 |
| 18. | INDO-09-2A | November 20, 2009 |
| 19. | 1203-09-9809 | December 3, 2009 |
| 20. | 1230-09-9893 | December 30, 2009 |
| 21. | 0114-10-9935 | January 14, 2010 |
| 22. | INDO-10-1A | January 14, 2010 |

h. USDA Export Certificates, Certificates of Islamic Slaughter, (corresponding to the respective item numbers noted in subparagraphs (e) and (g) above) and other documents pertaining to particular beef shipments were sent via wire by Midamar to customers in Malaysia and Indonesia, including on about the dates noted below, each of which is alleged as a separate overt act:

| No. | Date | Country | Method |
|---|---|---|---|
| 17. | 11-03-2009 | Indonesia | e-mail |
| 18. | 11-23-2009 | Indonesia | e-mail |
| 19. | 12-03-2009 | Malaysia | e-mail |
| 20. | 12-30-2009 | Malaysia | e-mail |
| 21. | 01-14-2010 | Malaysia | e-mail and fax |
| 22. | 01-14-2010 | Indonesia | e-mail |

i. USDA Export Certificates, Certificates of Islamic Slaughter, and other documents pertaining to particular beef shipments were deposited to be delivered with a private commercial interstate carrier, for shipments to Malaysia and Indonesia, including on about the dates noted below, each of which is alleged as a separate overt act:

| Export No. | Date | Carrier |
|---|---|---|
| 42870 | 01-14-2010 | Forward Air |

16

| | | |
|---|---|---|
| 42868 | 01-14-2010 | Forward Air |
| 59126 | 12-31-2009 | Forward Air |
| 59115 | 12-03-2009 | Forward Air |
| 59111 | 11-23-2009 | DHL |
| 59099 | 10-31-2009 | Forward Air |
| 59091 | 10-22 -2009 | Forward Air |

54. This was in violation of Title 18, United States Code, Section 371.

## COUNTS 2-8
### False Statement on Export Certificates

55. On about the following dates, each such act constituting a separate count, in the Northern District of Iowa, defendant WILLIAM B. AOSSEY, JR., did knowingly make, aid, abet, counsel, induce, and procure the making of a materially false statement on an official certificate provided for in regulations prescribed by the Secretary of Agriculture (Title 9 of the Code of Federal Regulations),to wit: by stating on a Department of Agriculture, Food Safety Inspection Service Form 9060-5, that the meat products reflected thereon were produced at USDA establishment number 889A, when in truth and fact the products had been produced at USDA establishment number 683.

| | COUNT | Date | Certificate Number |
|---|---|---|---|
| 56. | 2 | 10-21-2009 | MPH-059091 |
| 57. | 3 | 10-30-2009 | MPH-059099 |
| 58. | 4 | 11-19-2009 | MPH-059111 |
| 59. | 5 | 12-02-2009 | MPH-059115 |

17

| 60. | 6 | 12-30-2009 | MPH-059126 |
| 61. | 7 | 01-14-2010 | MPE-042868 |
| 62. | 8 | 01-14-2010 | MPE-042870 |

63. This was in violation of Title 21, United States Code, Sections
611(b)(5) and Title 18, United States Code, Section 2.

## COUNTS 9 – 15
### Wire Fraud

64. Paragraphs 1-30, 33-52, and 55-62 of this Indictment are incorporated by
this reference.

### Scheme to Defraud

65. Defendant and others schemed to sell and ship purported Halal beef to
customers in Indonesia and Malaysia, knowing that the beef did not meet each
countries' requirements for beef imports, because it did not originate from a
slaughter facility designated and approved by Indonesia or Malaysia, respectively.
As part of the scheme, defendant counseled and caused employees of Midamar and
ISA to change labels on the beef products, and to fabricate and falsify documents
accompanying the beef product shipments for the purpose of making it appear,
falsely, that the products originated from a designated approved slaughter facility.
The scheme and artifice to defraud was executed with the intent to result in
payment of money to Midamar.

18

66. On about each of the dates referenced below, in the Northern District of Iowa, for the purpose of executing or attempting to execute the above-referenced scheme and artifice to defraud and to obtain money by means of false and fraudulent pretenses, representations, and promises, defendant, WILLIAM B. AOSSEY, JR., and others known to the grand jury, knowingly caused, induced, procured, and aided and abetted the transmission, by means of wire communication in interstate commerce, of monetary payments to Midamar's bank account "1568" at CRBT, as outlined below, each transmission constituting a separate count:

|  | **COUNT** | Date | Amount Transmitted | From |
|---|---|---|---|---|
| 67. | **9** | 10-30-2009 | $ 7,982.50 | PT Indoguna (Surya Cemerlang) |
| 68. | **10** | 11-25-2009 | 15,081.33 | Suvinsa |
| 69. | **11** | 11-24-2009 | 31,794.92 | PT Indoguna (Surya Cemerlang) |
| 70. | **12** | 12-29-2009 | 16,105.73 | Suvinsa |
| 71. | **13** | 01-19-2010 | 7,685.00 | Suvinsa |
| 72. | **14** | 01-19-2010 | 31,874,80 | PT Indoguna (Surya Cemerlang) |
| 73. | **15** | 01-28-2010 | 74,459.40 | Suvinsa |

74. This was all in violation of Title 18, United States Code, Sections 1343 and 2.

## Wire Fraud Forfeiture Allegation

75. The allegations contained in paragraphs 1-30, 32-53, 55-62, and 65-73 of

19

this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

76. Upon conviction of the offenses in violation of Title 18, United States Code, Sections 371 and 1343, set forth in Counts 1 and 9 - 15 of this Indictment, the defendant, WILLIAM B. AOSSEY, JR., shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses. The property to be forfeited includes, but is not limited to, a money judgment in the amount of $ 134,080.01.

77. If any of the property described above, as a result of any act or omission of the defendant:

        a.    cannot be located upon the exercise of due diligence;
        b.    has been transferred or sold to, or deposited with, a third party;
        c.    has been placed beyond the jurisdiction of the court;
        d.    has been substantially diminished in value; or
        e.    has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

20

## COUNTS 16 -18
### Money Laundering

78. The allegations contained in paragraphs 1-30, 32-53, and 55-62 of this Indictment are hereby re-alleged and incorporated by reference.

79. On about each date specified below, in the Northern District of Iowa, defendant, WILLIAM B. AOSSEY, JR., did knowingly cause, aid, abet, induce, procure, attempt, or otherwise engage in one or more monetary transaction(s), within the United States, that is, payments to Tri-Bin, Inc., as described below, with each transaction constituting a separate count, involving criminally derived property having a value in excess of $10,000, that was derived from specified unlawful activity, that is, wire fraud, and conspiracy to commit wire fraud.

|     | **COUNT** | Date       | Check Number | Amount      | Payee   |
|-----|-----------|------------|--------------|-------------|---------|
| 80. | 16        | 11-30-2009 | 41529        | $18,750.00  | Tri-Bin |
| 81. | 17        | 01-04-2010 | 41806        | 18,750.00   | Tri-Bin |
| 82. | 18        | 02-01-2010 | 42024        | 22,168.52   | Tri-Bin |

83. This was in violation of Title 18, United States Code, Sections 1957(a) and 2.

## COUNT 19
### Money Laundering Conspiracy

84. Beginning in at least 2007 and continuing through on about 2012, in the Northern District of Iowa and elsewhere, defendant WILLIAM B. AOSSEY, JR., did knowingly and unlawfully combine, conspire, confederate and agree with other

21

persons whose names are known and unknown to the Grand Jury, to engage in and attempt to engage in one or more monetary transaction(s) within the United States, involving criminally derived property having a value in excess of $10,000 that was derived from specified unlawful activity, that is, wire fraud, and conspiracy to commit wire fraud, in violation of Title 18, United States Code, Sections 371 and 1343.

85. This in violation of Title 18, United States Code, Section 1956(h).

## Money Laundering Forfeiture Allegation

86. The allegations contained in Counts 16-18 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 982(a)(1).

87. Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 18, United States Code, Section 1956(h) or Section 1957, the defendant, WILLIAM B. AOSSEY, JR., shall forfeit to the United States of America any property, real or personal, involved in such offense, and any property traceable to such property.

88. If any of the property described above, as a result of any act or omission of the defendant:

      a. cannot be located upon the exercise of due diligence;
      b. has been transferred or sold to, or deposited with, a third party;
      c. has been placed beyond the jurisdiction of the court;

22

d. has been substantially diminished in value; or
e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property

pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title

18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section

2461(c).

A TRUE BILL

KEVIN W. TECHAU
United States Attorney

By:

RICHARD L. MURPHY
Assistant United States Attorney

/s/Foreperson

Foreperson

10-23-14

Date

23